## UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS

| | | |
|---|---|---|
| STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY and STATE FARM COUNTY MUTUAL INSURANCE COMPANY OF TEXAS, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Case No. 22-806 |
| | ) ) | |
| SANJAY MISRA, M.D.; and SANJAY MISRA, M.D., P.A. | ) ) | **PLAINTIFFS DEMAND TRIAL BY JURY** |
| Defendants. | ) ) | |

## <u>COMPLAINT</u>

State Farm Mutual Automobile Insurance Company ("State Farm Mutual") and State Farm County Mutual Insurance Company of Texas ("State Farm County"), for their Complaint against Defendants Sanjay Misra, M.D. ("Dr. Misra") and Sanjay Misra, M.D., P.A. ("Misra P.A.") (collectively, "Defendants"), allege as follows:

## I.     NATURE OF THE ACTION

1.     This action is brought by State Farm Mutual and State Farm County based upon hundreds of medical bills and supporting documentation that are fraudulent, which Defendants have knowingly submitted, and caused to be submitted, to State Farm Mutual and State Farm County for fraudulent evaluations that were performed as pretext to support recommendations for, and the performance of, medically unnecessary spinal injections and related procedures, and in many cases, recommendations for medically unnecessary surgeries, to exaggerate the severity and inflate the value of personal injury claims against State Farm Mutual and State Farm County or individuals who were eligible for insurance benefits under State Farm Mutual and State Farm County policies.

2.      As discussed below, Dr. Misra falsely purports to legitimately examine individuals ("patients") reporting neck and/or back pain and prescribe spinal injections, namely medically unnecessary epidural steroid injections ("ESIs") in at least one region of the spine, for nearly all such patients who present at Misra P.A.  (*See* Ex. 1, Pre-Injection Evaluation Appx.)  Dr. Misra then purports to perform such injections on patients without regard to whether they are needed to exaggerate the severity and inflate the potential value of personal injury claims.  (*See* Ex. 2, Injection Appx.)  When the unnecessary ESIs do not resolve patients' complaints, which is often the case, Dr. Misra then recommends expensive, medically unnecessary surgeries.

3.      The bills and supporting documentation Defendants submit, and cause to be submitted, to State Farm Mutual and State Farm County are fraudulent because:

a.      Dr. Misra does not perform legitimate examinations of the patients;

b.      patterns in the findings and diagnoses within the examination reports ("Evaluations") prepared by Dr. Misra prior to recommending injections are not credible and serve as pretext to support their predetermined recommendations for medically unnecessary ESIs for nearly all patients reporting neck and/or back pain (*see* Ex. 1);

c.      the injections Dr. Misra recommends and purportedly performs are not recommended and performed because they are medically necessary, but rather to substantially inflate the severity and potential value of the patients' claims;

d.      the boilerplate operative reports ("Operative Reports") prepared by Dr. Misra for the ESIs he purportedly performs are not credible based upon patterns in the patients' diagnoses and responses to the ESIs (*see* Ex. 2); and

e.      the surgical recommendations made by Dr. Misra are not recommended because they are medically necessary, but rather to substantially inflate the severity and potential value of the patients' claims (*see* Ex. 3.)

4.      The fraudulent scheme enriches Defendants by exploiting two common claims scenarios, namely (a) bodily injury claims ("BI Claims") made by individuals not substantially at fault for automobile accidents to the insurance companies of the individuals who are substantially

at fault for such accidents ("At-Fault Drivers"), in which they seek to recover economic losses (including past and future medical expenses) and noneconomic losses (including pain and suffering); and (b) underinsured/uninsured motorist claims ("UM Claims") made by individuals to their own insurance companies if their recoveries under BI Claims from the At-Fault Drivers' insurance companies are insufficient to compensate the individuals for their economic and non-economic losses as a result of the accident.

5.      Under Texas law, insurers may be subject to substantial liability if they fail to accept "reasonable" settlement demands on BI Claims.  Specifically, under the *Stowers* doctrine, if (1) an insurer for an At-Fault Driver fails to accept a reasonable settlement demand at or within policy limits in a short time frame, often 30 days or less, specified in the written demand from the injured party's PI Attorney, and (2) the At-Fault Driver incurs a judgment in excess of policy limits at trial, the insurer may be subject to liability for the excess judgment.  *See G.A. Stowers Furniture Co. v. American Indemnity Co.*, 15 S.W.2d 544 (Tex. 1929).

6.      Texas law also provides a statutory cause of action if an insurer "fail[s] to attempt in good faith to effectuate a prompt, fair, and equitable settlement of . . . a claim with respect to which the insurer's liability has become reasonably clear."  TEX. INS. CODE § 541.060(a)(2)(A); *see also* TEX. INS. CODE § 542.003.  If found liable for bad faith, an insurer may be responsible for compensatory damages, attorneys' fees, and potentially treble damages.  TEX. INS. CODE § 541.152.

7.      Defendants' scheme is designed to enrich themselves by inducing State Farm Mutual and State Farm County to:  (1) rely on their bills and supporting documentation that on their face substantiate the need for, and often the performance of, one or more ESIs for nearly all patients reporting neck and/or back pain, and in many cases, the need for costly and invasive spinal

surgeries; and (2) settle BI and UM Claims within policy limits, and often for all or most of the limits, to protect themselves and their insureds from potential judgments exceeding policy limits and/or avoid potential liability for bad faith claims.

8.      To facilitate their scheme, Defendants:  (a) prepare fraudulent Evaluations to create the appearance patients suffered serious injuries that warrant ESIs, often to more than one spinal region; (b) purportedly perform medically unnecessary injections; (c) prepare bills from Misra P.A. with typical charges of $499 for the initial examinations and typical charges of at least $3,300 for each ESI; (d) often recommend patients undergo surgeries, which are estimated to cost in excess of $50,000 (not including fees for anesthesia and related items Dr. Misra estimates cost an additional $50,000); and (e) provide their fraudulent documentation and bills to the PI Attorneys representing the patients in BI Claims and UM Claims who, in turn, submit the documentation and bills to State Farm Mutual and State Farm County to support written demands to settle the claims within policy limits, often within 15 days or less.  (*See* Ex. 4, RICO and Demand Appendix; *see also* Ex. 5, Demand Letter for Patient M.T. ("Based upon discussion with my client, I have been authorized to demand $1,000,000.00 . . . .  This settlement offer will expire [in] 14 days.").

9.      Defendants' fraudulent bills and supporting documentation are designed to be and, in fact, have been substantial factors in inducing State Farm Mutual and State Farm County to settle the BI Claims and UM Claims at issue by causing them to make higher settlement offers than would be warranted without the fraudulent bills and supporting documentation from Defendants.  (*See* Ex. 4, RICO and Demand Appendix.)  Absent Defendants' fraudulent bills and supporting documentation, many, if not most, of these claims would involve primarily chiropractic and/or physical therapy treatment for alleged soft tissue injuries with total medical expenses that would be significantly less than policy limits.   Dr. Misra's fraudulent Evaluations with

recommendations for ESIs, his performance of one or more medically unnecessary ESIs, with total unbundled charges of $3,800-$4,300 per injection procedure, and his frequent recommendation for surgery costing more than $50,000, cause the severity and potential value of the claims to be artificially and substantially inflated.

10.     State Farm Mutual and State Farm County have sustained damages of more than $1.1 million in settling the BI and UM Claims at issue.  Defendants' fraudulent documentation and bills have been a substantial factor and, in fact, have caused State Farm Mutual and State Farm County to incur damages by agreeing to settle claims that otherwise might not have been settled, or by paying substantially more to settle these claims than they would had they known Defendants' bills and supporting documentation were fraudulent.  State Farm Mutual and State Farm County were the target of Dr. Misra's scheme and their damages are directly related to and a natural consequence of the scheme.  As a result, State Farm Mutual and State Farm County are entitled to damages in excess of $1.1 million, or to a lesser amount to be proven at trial, but no less than the amounts Defendants actually received as a result of the scheme.

11.     The scheme began at least as early as 2013 and has continued uninterrupted since that time.

12.     State Farm Mutual and State Farm County bring this action asserting a statutory claim under 18 U.S.C. § 1962(c) ("RICO"), as well as a common law claim for money had and received to recover actual damages in excess of $1.1 million, or to a lesser amount to be proven at trial, but no less than the amounts Defendants actually received as a result of the scheme, plus treble damages and costs, including reasonable attorneys' fees.

## II.   JURISDICTION AND VENUE

13.     Pursuant to 28 U.S.C. § 1331, this Court has jurisdiction over the RICO cause of action brought under 18 U.S.C. §§ 1961 *et seq.* because it arises under the laws of the United States.

14.     Pursuant to 28 U.S.C. § 1367(a), this Court also has supplemental jurisdiction over the money-had-and-received cause of action because it is so related to the RICO cause of action over which the Court has original jurisdiction that they form part of the same case or controversy.

15.     Pursuant to 28 U.S.C. § 1391(a), venue is proper in this district because Defendants reside here and a substantial part of the events or omissions that gave rise to the causes of action occurred here.

## III.   THE PARTIES

### A.   Plaintiffs

16.     State Farm Mutual Automobile Insurance Company is a citizen of the state of Illinois.  It is incorporated under the laws of the state of Illinois, with its principal place of business in Bloomington, Illinois.  State Farm Mutual is licensed and engaged in the business of insurance in Texas.

17.     State Farm County Mutual Insurance Company of Texas is a citizen of the state of Texas.  It is incorporated under the laws of the state of Texas, with its principal place of business in Dallas, Texas.  State Farm County is licensed and engaged in the business of insurance in Texas.

### B.   Defendants

18.     Defendant Sanjay Misra, M.D. resides in and is a citizen of the state of Texas. Dr. Misra has been licensed to practice medicine in Texas since 1993.   In or around September 1996, Dr. Misra formed Misra P.A.  (*See* Ex. 6, Misra P.A. Articles of Association.)

Misra P.A.'s Articles of Association list Dr. Misra as the registered agent for service of process and its original member.  *See id.*  Furthermore, in the most recent Franchise Tax Public Information Report, Misra P.A. lists Dr. Misra as the President and the registered agent for service of process. (*See* Ex. 7, Misra P.A. 2018 Public Information Report.)  Since at least 2013, Dr. Misra has been performing evaluations and spinal injections as well as making surgical recommendations at Misra P.A.  Moreover, Dr. Misra and Misra P.A. have knowingly submitted, and caused to be submitted, hundreds of medical bills and supporting documentation that were fraudulent to State Farm Mutual and State Farm County in the claims described in part in the charts attached hereto as Exs. 1-4.

19.     Defendant Sanjay Misra, M.D., P.A. is a Texas professional association with its registered office located at 3109 N. St. Mary's, San Antonio, Texas 78212.  As noted above, Articles of Association filed with the Texas Secretary of State on or about September 19, 1996, indicate Dr. Misra was the original member.  Misra P.A. provides pain management services at 315 N. San Saba, Suite 1175, San Antonio, Texas 78207.  Misra P.A. has knowingly submitted, and caused to be submitted, hundreds of medical bills and supporting documentation that were fraudulent to State Farm Mutual and State Farm County in the claims described in part in the charts attached hereto as Exs. 1-4.

## IV.   ALLEGATIONS COMMON TO ALL COUNTS

### A.     The Legitimate Diagnosis and Treatment of Neck and Back Pain

20.     When a patient complains of neck or back pain following a motor vehicle accident, a licensed professional must obtain a detailed history and perform a legitimate examination to arrive at a proper diagnosis.  Based upon a legitimate diagnosis, a licensed professional must then engage in medical decision making to design a legitimate treatment plan tailored to the unique needs of each patient.

21.     The decision of which, if any, types of treatment are appropriate for a patient, as well as the level, frequency, and duration of the various treatments should be individualized.  This individualized decision must consider the patient's unique circumstances, including his or her: (a) age; (b) social, family, and medical history; (c) physical condition, limitations, and abilities; (d) location, nature, and severity of the injury and symptoms; (e) response to any previous treatment; and (f) the nature of the accident.

22.     Treatment plans should generally start with conservative care that is not invasive, such as anti-inflammatory medications, chiropractic care, and/or physical therapy, which may benefit patients by healing their injuries and relieving their symptoms with minimal associated risks and costs.  If patients' symptoms are not relieved through conservative care, other forms of treatment may be appropriate to relieve their symptoms, including various kinds of injections and other procedures designed to reduce pain and other symptoms caused by inflammation, irritation, or other conditions.  As with any other treatment option, whether to perform any kind of injection or other procedure should be tailored to the unique circumstances of each patient.

**B.     Dr. Misra's Purported Treatment Runs Contrary to the Legitimate Use of ESIs and Other Common Spinal Injections**

23.     A provider may recommend and perform injections to treat pain in areas of the spine and to diagnose the source of the pain.  Because injections are invasive, expose patients to ionizing radiation, often involve the injection of steroids into the body, and may involve the use of sedation, they present associated risks as well as increased costs to patients.  Therefore, injections should be performed only when appropriate indications are present and they are medically necessary to diagnose and/or treat pain in and around the spine or other structures, to alleviate pain to facilitate conservative care, or to alleviate pain after conservative care has failed

or is not an option.  Four common types of injections used to treat neck and/or back pain are ESIs, facet injections ("FIs"), medial branch blocks ("MBBs"), and trigger point injections ("TPIs").

24.     The indications for ESIs are different from the indications for FIs and MBBs.  The common clinical indication for ESIs is nerve-related pain radiating from the neck into the shoulders or arms or from the lower back into the buttocks or legs.  By contrast, the common clinical indication for FIs and MBBs is pain primarily concentrated in the back or neck (*i.e.*, axial pain).

25.     The indications for ESIs are also different from the indications for TPIs, which are a common type of muscular injection.  Trigger points, also known as trigger sites or knots, are irritable portions of patients' muscles associated with palpable nodules in taut bands of the muscle fibers.  They may cause local pain at the site of the trigger point, or they may irritate the nerves around the muscle causing referred pain elsewhere in the body.  Trigger points may be caused by a number of factors, including acute or chronic muscle overload and acute trauma.  TPIs involve the injection of a local anesthetic or corticosteroid into the trigger point to alleviate the pain.

26.     In a legitimate pain management clinical setting, across a population consisting of hundreds of patients complaining of neck and/or back pain, one would expect a mixture of patients for which (1) no spinal injections would be indicated, (2) ESIs would be indicated, (3) FIs would be indicated, (4) MBBs would be indicated, and (5) muscular injections, such as TPIs, would be indicated.  In other words, one would not expect to see spinal injections indicated for virtually all patients with neck and/or back pain, nor would one expect to see ESIs indicated for virtually all such patients, like here.  (*See* Ex. 1, Pre-Injection Evaluation Appx.)

27.     Moreover, there are three basic types of ESIs – interlaminar, caudal, and transforaminal injections – each of which may be performed to relieve a patient's symptoms by

introducing steroid medications into the epidural spaces surrounding the vertebral levels at which the suspected pain-generating pathologies exist.  An interlaminar ESI involves inserting a needle into the posterior epidural space between two adjacent vertebral lamina and delivering anesthetic and steroids, which then typically spread to epidural spaces above and below the injected space. A caudal ESI involves inserting a needle through the sacral hiatus (a small boney opening just above the tailbone) to deliver anesthetic and steroids that typically spread to epidural spaces above the injected space.  A transforaminal ESI involves inserting a needle into the intervertebral neural foramen.  In a transforaminal ESI, the provider injects the anesthetic and steroid into the area referred to as the "neural foramen," which allows the steroid to travel up the sleeve and into a targeted epidural space.  Although there is an increased level of technical expertise required to perform transforaminal ESIs, this type of injection allows for greater precision in targeting the source of the patient's pathology, which results in a more concentrated delivery of the steroid into the affected area.

28.     Prior to recommending and performing an ESI or any other spinal injection, a thorough physical examination involving several orthopedic, neurological, and other tests is required to evaluate for associated sensory, motor, or reflex deficits in the involved limb(s) to help guide treatment and establish a baseline status before initiating invasive treatments such as injections.  Normally, the clinical findings and indications are correlated with radiologic evidence (*e.g.*, MRIs) of nerve-root irritation, inflammation, or compression at spinal levels that are consistent with the distribution of the patients' nerve-related pain and/or physical examination findings and may be attributable to pathologies in and around the nerve roots.  Dr. Misra's Evaluations reveal the same cursory examination findings and result in recommendations that

virtually all patients with neck and/or back pain receive a recommendation for an interlaminar ESI. (*See* Exs. 1-2.)

29.     The patterns in the injections recommended and purportedly performed by Dr. Misra are not credible.  State Farm Mutual and State Farm County have thus far identified 335 patients who, according to the Evaluations submitted or caused to be submitted to them over the past four years, complained of neck and/or back pain and treated at Misra P.A.  Of those patients, Dr. Misra recommended and/or performed spinal injections on 300 of those patients, and Dr. Misra recommended ***all*** such patients undergo the same type of injection, namely interlaminar ESIs.  (Ex. 1, Pre-Injection Evaluation Appx.)  Indeed, Dr. Misra did not recommended these patients to undergo any type of spinal injection other than an interlaminar ESI, such as an FI, MBB, TPI, or even another type of ESI.  (*See id.*)

30.     Further, for the 35 patients who were not recommended, or did not receive, a spinal injection, many of them either (a) were recommended and/or received a non-spinal injection from Dr. Misra or (b) have a notation in their Evaluation the patient refused treatment.

### C.     Risks and Costs Associated with Spinal Injections

31.     Because ESIs entail the insertion of needles into areas in and around the spine, injections may be performed under fluoroscopic guidance and typically include the use of steroids These injections involve potentially serious risks and substantially increased costs for the patient. Therefore, ESIs should not be performed unless they are medically necessary, and if they are performed, attempts should be made to minimize the risks and costs.  The risks associated with these injection procedures include those associated with the patient's exposure to ionizing radiation from the use of fluoroscopy, the side effects and complications from steroids (*e.g.*, increased blood sugar, increased blood pressure, immunity reduction with the increased risk of

systemic infection, adrenal suppression, psychosis, acute and chronic changes to the skin and bones such as osteoporosis and fractures, and avascular necrosis), and the direct procedure risks from the injection such as bleeding, infection, nerve injury, paralysis, and even death.  Finally, the costs associated with injection procedures can be substantial, as evident in Misra P.A.'s typical charges, which are $3,800-$4,300 per ESI procedure.

32.      As discussed below, the Dr. Misra did not perform legitimate exams or make legitimate exam findings.  Instead, despite the associated risks and costs, Dr. Misra's Evaluations were performed as a pretext to support their recommendation for ESIs for nearly all patients reporting neck and/or back pain.  This was done to substantially inflate the seriousness and potential value of BI and UM Claims to cause State Farm Mutual and State Farm County to settle those claims within policy limits, and often for all or most of those limits, to protect themselves and their insureds from potential judgments exceeding policy limits and/or avoid potential liability for bad faith claims.

### D.      The Legitimate Purpose of Spinal Surgeries and the Accompanying Risks

33.      There are numerous types of spinal surgeries, which treat different types of spinal issues and patient complaints.  Spinal surgeries should be considered only as a last resort after more conservative methods of treatment fail, and for patients with severe conditions.  Spinal surgeries present considerable risks, and recommending or performing spinal surgeries on patients without exhausting alternative methods of potential treatment places patients at risk unnecessarily. Dr. Misra recommends two types of spinal surgeries for his patients.

34.     The first type of surgery Dr. Misra recommends is a microdiscectomy.[1]   A microdiscectomy is an invasive surgery performed on individuals suffering from radiating pain resulting from a herniated disc causing pressure to the spinal nerve column (spinal cord) and/or spinal nerve root(s).  Importantly, while many patients may have herniated discs, that condition alone is not an indication for a microdiscectomy.  For a microdiscectomy to be beneficial, the disc herniation must be causing pressure on the spinal nerve column, which would be indicated in a radiologist's MRI report.  A microdiscectomy involves shaving off the portion of a herniated disc pressing on the patient's spinal column and causing radiating pain.  While a microdiscectomy will help a patient suffering from radiating pain, if a patient is only experiencing axial pain (*i.e.*, pain that is not radiating), the surgery will provide no relief to the patient.

35.     The second type of surgery Dr. Misra recommends is an anterior cervical discectomy and fusion ("ACDF").  Like a microdiscectomy, an ACDF is an invasive surgery performed on individuals suffering from radiating pain resulting from a herniated disc causing pressure to the spinal cord and/or spinal nerve root(s).  As discussed above, while many patients may have herniated discs, such a condition alone is not an indication for an ACDF.  For an ACDF to be beneficial, the disc herniation must be causing pressure on the spinal cord, which would be indicated in a radiologist's MRI report.  An ACDF is performed by entering the front of a patient's neck and performing a discectomy (*i.e.*, shaving off the portion of the patient's herniated disc pressing against the spinal cord).  Following the discectomy, the cervical portion of the patient's spine where the discectomy was performed is weakened and the patient's spine must be stabilized.  To add stability, a fusion is performed by inserting a plate onto the patient's spine.  Similar to a

---

[1] Defendants occasionally refer to a microdiscectomy in their records as a "MITR," which is a method of performing a microdiscectomy.

microdiscectomy, an ACDF will provide relief for radiating pain, but will likely not provide any relief to patients who are merely suffering from axial pain.

36.     Due to the invasive nature of microdiscectomies and ACDFs, as well as the risks of these surgeries, a physician should exhaust all conservative care alternatives before recommending a patient undergo a microdiscectomy or ACDF.  Typically, patients will undergo months of chiropractic care and physical therapy before being recommended for a microdiscectomy or ACDF.  Further, to be a candidate for those surgeries, a patient should undergo an MRI which indicates a herniation is causing pressure to the spinal cord.  Additionally, a patient will likely not be a candidate for a microdiscectomy or ACDF unless the patient has undergone ESIs that provided significant relief for a period of a week or two, but not permanent relief.  An ESI that provides significant temporary relief, but not permanent relief, confirms the patient's pain is due to pressure on the spinal cord.  If an ESI provides only slight or temporary relief for a patient, a microdiscectomy or ACDF is unlikely to provide significant relief.

37.     As discussed above, microdiscectomies and ACDFs present significant risks.  For instance, both microdiscectomies and ACDFs are typically performed under general anesthesia, which can cause pneumonia, strokes, and even death.  Additionally, because microdiscectomies and ACDFs are spinal operations, there is a risk that patients can become paralyzed.  More commonly, though, a microdiscectomy or ACDF can actually cause patients to experience significant radiating pain due to the spinal cord being irritated or injured during surgery.  And, like most surgeries, microdiscectomies and ACDFs present risks of significant bleeding and infection.

38.     ACDFs present additional risks.  Indeed, because an ACDF requires a surgeon to enter the front of a patient's neck to reach the spine, the surgeon is operating near the carotid artery and other significant blood vessels.  A minor error in this region of the body can cause significant

bleeding or death.  Further, even absent error, a hematoma can form and create pressure on various blood vessels, trachea (airway), or the spinal nerve column, which can cause pain, restrict blood flow and/or result in breathing difficulty for the patient.

### E. Dr. Misra's Fraudulent Evaluations and Treatment Recommendations

39.     The scheme begins with Dr. Misra conducting cursory initial examinations that serve as mere pretext for his recommendation of ESIs in at least one region of the spine for virtually every patient reporting neck and/or back pain.  During his examinations, Dr. Misra purports to take the patients' history, perform physical exams, reach diagnoses, and arrive at a treatment plan, all of which are documented in his Evaluations.

### 1. The Fraudulent Examination Findings

40.     The Evaluations do not reflect the patients' legitimate examination findings or a medically necessary treatment plan tailored to each patient's unique circumstances.  Rather, they are boilerplate, include nonspecific information about the patients' conditions, and reveal non-credible patterns.  (*See* Ex. 1.)  For instance, in the "Chief Complaints" section of each report, Dr. Misra virtually always documents patient complaints of "Radiating Pain" and "Numbness."  (*Id.*, Columns G-H.)  Next, in the "Physical Exam" section of the report, Dr. Misra finds a vast majority of patients: (1) experience tenderness or pain with soft tissue palpations, (*id.*, Column J, O), (2) experience motor strength deficits (*id.*, Columns K, P) and (3) have a "decreased/diminished sensation" in the area(s) in which the patient allegedly had complaints (*id.*, Columns L, Q). Moreover, when orthopedic tests are performed, almost all patients have the same positive orthopedic test results, namely positive Spurling's test findings for patients reporting cervical pain and/or positive Straight Leg Raise ("SLR") test findings for patients reporting lumbar pain.  (*Id.*, Columns M, R.)  The uniformity of these same findings across hundreds of patients, as well as the

general and non-specific description of these findings in the evaluations, is not credible and suggests Dr. Misra did not legitimately examine or evaluate the patients in these areas.

41.     Dr. Misra also fails to meaningfully account for the patients' prior medical conditions or treatment.  Based upon the risks and costs associated with ESIs, patients' medical and treatment histories are important considerations in determining whether to recommend or perform spinal injections.  Among other things, physicians like Dr. Misra should consider the time and circumstances surrounding the onset of the patients' symptoms, the nature and duration of any treatment the patients have received, and the nature, level, and progress of the patients' responses to such treatment.  Although nearly all patients received some form of prior medical care before seeing Dr. Misra, his Evaluations almost never include any meaningful discussion regarding the care provided or the patients' responses to that care.  Rather, the Evaluations have a section—titled "Patient's Care Team"—where Dr. Misra can indicate the patient's concurrent or prior physicians; however, this section virtually always says "None recorded," even when most patients are being seen by other providers.  (*See e.g.*, Ex. 8, Evaluation for Patient K.F.; *but see*, Ex. 9, Chiropractic Notes for K.F.)  Dr. Misra provides no information regarding the type of treatment patients have received, how long they received it, the extent and duration of the relief, or whether the patients attempted any form of conservative care prior to being seen by him.  Moreover, the Evaluations provide no indication Dr. Misra ever attempted to obtain or review the records associated with the patients' prior treatment and factor them into their examinations or treatment plans.

42.     For other patients, Dr. Misra recommended (and performed) injections even though the patient had undergone minimal or no conservative care.  For example, Dr. Misra evaluated Patient E.M. only thirteen days after his accident.  (*See* Ex. 10, E.M.'s 10/18/18 Evaluation.)  At that time, E.M. visited his chiropractor twice.  (*See* Ex. 11, E.M's Chiropractor notes through

11/16/18.)  Despite this, during E.M.'s first visit, Dr. Misra recommended he undergo an ESI.  (*See* Ex. 10.)  The following day, Dr. Misra performed a cervical ESI on E.M., the first of two ESIs Dr. Misra ultimately performed on him.  (*See* Ex. 12, E.M.'s Operative Reports.)  Finally, while still being treated by a chiropractor, and approximately two months after his accident, Dr. Misra recommended E.M. undergo an ACDF costing approximately $80,000.  (*See* Ex. 13, E.M.'s Opinion Letter.)

43.     As explained above, given the risks and costs associated with spinal injections, a patient's treatment should generally start with conservative care that is not invasive, such as anti-inflammatory medications, chiropractic care, and/or physical therapy, which may benefit patients by healing their injuries and relieving their symptoms with minimal associated risks and costs.  If patients' symptoms are not relieved through conservative care, other forms of treatment – including various kinds of injections and other procedures designed to reduce pain and other symptoms caused by inflammation, irritation, or other conditions – may be appropriate to relieve their symptoms.

44.     Determining whether an ESI is indicated for any patient requires the performance of a legitimate physical examination, which Dr. Misra fails to perform.  As stated above, for patients reporting neck and/or back pain during their Evaluations, Dr. Misra includes only a few lines regarding their purported neuromuscular examination in which he virtually always find the patients experience: (1) radiating pain, (2) numbness, (3) tenderness or pain from soft tissue palpation, (4) "decreased/diminished sensation" in the area(s) of alleged complaint, and (5) abnormal motor strength.  (Ex. 1, Columns G-H, J, O, L, Q, K, P.)  Such uniformity in the general nature of the examination findings across patients is not credible.

45.     Dr. Misra's routine findings of radiating pain for virtually all patients reporting neck and/or back pain not only lack credibility, but they are often inconsistent with patients' contemporaneous records from other treating providers.  For instance, prior to visiting Dr. Misra, Patient J.L. had seen a chiropractor numerous times, and J.L.'s chiropractor never once noted that J.L. experienced any radiating pain.  (*See* Ex. 14, J.L.'s Chiropractic Records *See id.*)  However, on May 26, 2020, Dr. Misra examined J.L. and recorded that J.L. "HAS LOW BACK PAIN RADIATING TO HIS LEGS."  (Ex. 15, J.L.'s 05/26/20 Evaluation.)

46.     Similarly, Patient A.S. filled out a patient intake form at Dr. Misra's office, in which she indicated she was suffering only from axial pain in her lower back. (*See* Ex. 16.)  Despite this statement on Dr. Misra's own paperwork, Dr. Misra nevertheless prepared an Evaluation for A.S. noting she was suffering from radiating pain, which he used as a justification to recommend and perform three lumbar ESIs on A.S. within a short period of time.  Not surprisingly, none of these ESIs provided A.S. any significant relief, and Dr. Misra ultimately recommended A.S. undergo a microdiscectomy.  (Ex. 17, A.S.'s 12/20/2018 Evaluation.)

47.     The limited information provided on the Evaluations regarding Dr. Misra's purported neck and/or low back findings is not sufficient to evaluate the patients' conditions.  For instance, finding tenderness or pain upon soft tissue palpations is non-specific and indicates no legitimate effort was made to evaluate the patients' conditions and determine a medically necessary treatment plan.  Additionally, "decreased" or "diminished" sensation findings made by Dr. Misra for virtually all patients reporting neck and/or back pain fail to include documentation regarding: (a) the specific tests performed to reach particular findings; (b) any objective quantification of the severity of the findings (aside from the word "decreased" or "diminished"); or (c) how the findings impact the patients' treatment.

48.     Dr. Misra also routinely documents a positive Spurling's test for cervical patients and a positive SLR test for lumbar patients, but his purported findings are not documented in a meaningful manner and the results of those tests do not appear to have any impact on the patients' recommended treatment.  The Spurling's test is performed by a doctor turning the patient's head to each side while extending and applying downward pressure.  The SLR test is performed by a doctor having the patient lay on his or her back, then lifting each of the patient's legs while his or her knee remains straight.  These tests are generally indicated when a patient complains of pain that radiates into his or her upper extremities (for the Spurling's test) or lower extremities (for the SLR test) so a doctor can determine whether nerve root irritation is the cause of the patient's symptoms.  If the patient experiences pain while the tests are being performed, then the tests are positive and indicate the presence of nerve root irritation, a condition often associated with disc protrusions and/or radiculopathies, which could be indications for an ESI.  Importantly, when a test is positive, the doctor should document that patient's specific responses.  For instance, when an SLR test is positive, the provider should record the affected leg and the angle (in degrees) at which the test elicited pain, as well as the nature, degree, and distribution of the pain to isolate the location and degree of the injury or condition contributing to the patient's symptoms, and to establish a baseline to assess the patient's progress, or lack thereof, over time.  When Dr. Misra conducts the Spurling's and SLR tests, he documents only basic findings regarding the generalized location of the purported test result (*e.g.*, "Spurling's test positive" or "straight leg raising test positive") with no other necessary information.

49.     Moreover the purported results of the Spurling's and SLR tests do not appear to have any impact on Dr. Misra's treatment recommendation.  Indeed, some patients did not even have positive findings on the Spurling's or SLR test, but Dr. Misra nevertheless recommended

they undergo ESIs.  For example, when Patient J.G. first saw Dr. Misra on November 6, 2019, Dr. Misra recommended J.G. undergo a cervical ESI, even though no positive Spurling's test finding was recorded.  (*See* Ex. 18, J.G.'s 11/06/19 Evaluation.)

### 2.    The Fraudulent Treatment Recommendations

50.    Based upon the patient's noncredible examination findings documented in the fraudulent Evaluations, Dr. Misra subjects almost all patients reporting neck and/or back pain to predetermined injection recommendations, which are not tailored to the unique needs of any patient, not altered based upon previous treatments by other providers, and not altered due to changes in the patients' conditions.

51.    Dr. Misra recommends virtually all patients with neck and/or back pain undergo a cervical interlaminar ESI, lumbar interlaminar ESI, or both.  As stated above, every patient receiving a spinal injection recommendation from Dr. Misra was recommended one or more ESIs. (Ex. 1, Pre-Injection Evaluation Appx.)  Indeed, Dr. Misra has not recommended a single TPI, FI, or MBB for any of the patients at issue purportedly experiencing neck and/or pain.  As described above, TPIs, FIs, and MBBs are also common types of neck and back injections, and they have different indications than ESIs.  Across hundreds of patients in a legitimate pain management clinical setting, one would expect to see significant variation in the types of procedures recommended and performed.  Furthermore, while Dr. Misra almost always omitted the specific type of ESI he was recommending (interlaminar or transforaminal) in the Evaluations themselves, based on the ESIs performed, Dr. Misra always recommended interlaminar ESIs.  Across hundreds of patients receiving ESIs, one would expect to see variation in the treatment recommended and provided.

52.     Dr. Misra recommended (and even performed) ESIs for minors, a practice which is rare, and older patients, who are inherently more susceptible to complications.   For instance, Dr. Misra recommended 14-year old Patient D.S. undergo an ESI, which he ultimately performed. (Ex. 19, D.S.'s Evaluation and Operative Report; *see also* Exs. 18, 20, J.G.'s Evaluation and Operative Report (recommending cervical and lumbar ESIs for 16-year-old).)   Dr. Misra also recommended 79-year-old Patient J.L. undergo an ESI, which he ultimately performed.  (Exs. 15, 21, J.L.'s Evaluation and Operative Report.)

  **F.**  **The Fraudulent Operative Reports and Injections**

53.     A majority of the patients who received a recommendation for an injection returned to Misra, P.A. and purportedly received at least one injection; and of those patients, most received more than one injection.   In fact, across the 276 patients that received ESIs from Defendants, Dr. Misra performed a total of 792 interlaminar ESIs.  (*See* Ex. 2, Injection Appendix.)  For those patients that received an injection, Dr. Misra generated Operative Reports reflecting the medically unnecessary ESIs.

54.     Dr. Misra places his "pre operative diagnosis" in his Operative Reports for the ESIs he purportedly performs.  (*See, e.g.*, Ex. 12.)   In other words, Dr. Misra does not document diagnoses in his Evaluations, but only documents diagnoses in Operative Reports for those patients that return to receive ESIs.   Nonetheless, based on the non-credible findings contained in the Evaluations, Dr. Misra diagnoses virtually all patients receiving an ESI with the same diagnoses, namely radiculopathy in one or more regions. (Ex. 2, Column F.) These identical diagnoses across hundreds of patients are not credible and merely serve as pretext for Dr. Misra's routine recommendations to receive ESIs.

55.     Moreover, in virtually all patients who received an Operative Report, Dr. Misra reported the patient's "radiculopathy" was "resistant to conservative measures." (*See, e.g.*, Ex. 12.)  Indeed, virtually every Operative Report claims the "[p]atient has exhausted conservative measures including therapy, trial of NSAIDs and pain medications." (*See* Exs. 12, 17, 19-20, 21; Ex. 2, Injection Appendix, Column F.)

56.     Dr. Misra is not shy about his motives in recommending and performing ESIs. Patient A.M. went to Dr. Misra for an Evaluation and was recommended for an ESI. (*See* Ex. 22, A.M.'s Evaluation.)  A.M. was later deposed and described her experience with Dr. Misra:

Q.  All right.  And what did [Dr. Misra] recommend for you?

A.  He wanted to do this injection into my -- I guess into my spine.

     I guess that's what they do.

Q.  Okay.  And did you do it?

A.  No.

[. . . ]

Q.   Why [did you not go back to Dr. Misra after your initial appointment]?

A.  I didn't like what I was told once I -- once he had described what was going to be done.  And then I was like, you know, an injection into your spine?  And he -- he just made a comment that I didn't like and then –

Q.  What was the comment?

A. He said something along the lines of, "***Well, no shot, no money***"

    or something.  And I was like, "Okay.  That's not what I'm here

    for."

(Ex. 23, Transcript of A.M. at 42:21-43:17 (emphasis added).)  In other words, Dr. Misra expressly told A.M. she should receive an ESI ***so that she could receive more money in her insurance claim***.

57.    The routine injections purportedly performed by Dr. Misra for pecuniary gain subject his patients to undue risks.  Indeed, according to Patient K.L.'s testimony, he had a prior adverse reaction to an ESI, causing half of his face to lose feeling.  (*See* Ex. 24, Transcript of K.L at 97:18-98:21.)  When K.L. brought this up with Dr. Misra at his first date of service where Dr. Misra had recommended an injection, Dr. Misra claimed the previous doctor "didn't properly inject [K.L.]" (*id.* at 121:4-5) and that the only potential side effect from an ESI was "a headache" (*id.* at 122:10).[2]  Dr. Misra, for instance, did not tell K.L. paralysis was a risk associated with ESIs. (Ex. 24, Transcript of K.L at 122:20.)  Despite this, Dr. Misra's Operative Report for K.L. reveals the same boilerplate language that he discussed the "risks and benefits of the procedure itself in great detail," and Dr. Misra administered a cervical ESI to K.L.  (Ex. 26, K.L. 5/29/19 Operative Report.)  K.L. testified the cervical ESI "helped a little, but not much" (Ex. 24, Transcript of K.L at 127:24) and the slight relief only lasted "a day" (*id.* at 128:8.).  In short, K.L. described the ESIs as "ineffective."  (*Id.* at 129:3-12.)  Despite telling this to Dr. Misra (*id.* at 128:9-12), Dr. Misra administered three additional ESIs to K.L.—two lumbar ESIs and one cervical ESI (Ex. 27, Patient K.L. Operative Reports.)

---

[2] Additionally, Dr. Misra's Evaluation of K.L. never mentions he had an adverse reaction to a prior ESI, or even that he had already undergone prior ESI treatment.  (*See* Ex. 25, K.L. 5/29/19 Evaluation.)

### G.      The Fraudulent Surgical Recommendations

58.     Of the hundreds of patients who received ESIs from Dr. Misra, approximately half of them also received a recommendation for spinal surgery from Dr. Misra.  (Ex. 3, Surgical Recommendation Appx.)  Dr. Misra typically recommends these patients undergo one of two procedures, either a microdiscectomy or an ACDF.  (*Id*.)   However, for at least 50 patients, Dr. Misra recommended they undergo ***both*** types of surgeries.  (*Id*.)  Dr. Misra often justified these surgical recommendations by pointing to the failure of ESIs to relieve the patient's pain – ESIs he recommended and purportedly performed.   Of course, as explained above, these ESIs were medically unnecessary and unjustified, making their failure unsurprising.

59.     Dr. Misra frequently recommends surgery even where there is no indication a surgery would provide any relief to the patient.  For example, prior to being seen by Dr. Misra, Patient A.S. underwent an MRI of the lumbar spine.  (*See* Ex. 28, A.S.'s MRI Report.)  While the MRI showed a minor herniation of the spine, there is no indication the herniation was causing any pressure on the spinal nerve column and/or spinal nerve root(s).  (*Id.*)  Moreover, in the patient intake form filled out by A.S., she never indicated she was even suffering from radiating pain (*e.g.*, pain in her legs).  (*See* Ex. 16, A.S.'s Intake Form.)  To the contrary, A.S. merely indicated she was suffering from axial pain the lower back.  (*Id*.)  Despite this, Dr. Misra's Evaluation for A.S. documents she was suffering from radiating pain, which he used to justify three medically unnecessary ESIs on A.S., which ultimately provided no significant relief.  (Ex. 17, A.S.'s Evaluations and Operative Reports.)  Given the lack of significant relief from the ESIs and the minimal MRI findings, there was no indication a microdiscectomy would be beneficial for A.S. Nonetheless, Dr. Misra recommended A.S. undergo a microdiscectomy, which he estimated to

cost between $50,000-$55,000 along with $58,500 of additional fees. (Ex. 29, A.S.'s Opinion Letter.)

60.     Similarly, Dr. Misra recommended spinal surgery to Patient K.L. before he had even performed an ESI on K.L. Indeed, K.L. testified during his first visit Dr. Misra told K.L. he needed surgery and his "symptoms would never get better" unless a surgery was performed.[3] (Ex. 24, Transcript of Patient K.L at 119:21.) Even though Dr. Misra apparently determined a surgery was necessary, Dr. Misra performed numerous ESIs on K.L. (Ex. 27, Patient K.L. Operative Reports.) K.L. described each ESI as "ineffective," indicating a microdiscectomy or ACDF would not be beneficial. (Ex. 24, at 129:3-12.) Nonetheless, Dr. Misra recommended K.L. undergo a microdiscectomy. (Ex. 30, Patient K.L. Final Evaluation.)

61.     Dr. Misra's recommendations for spinal surgeries are indiscriminate and not based on patient needs. For example, Patient J.C. underwent an MRI, which indicated J.C. had a mild herniation at the C5-C6 level of the cervical spine, but there was no "significant central canal or neural foraminal narrowing," meaning this herniation was almost certainly not causing radiating pain. (Ex. 31, J.C.'s MRI Report.) In fact, Dr. Misra never administered an ESI to J.C. at the C5-C6 level of the spine, although an ESI was performed at C4-C5. (Ex. 32, J.C.'s Operative Report.) Notably, ESIs are not commonly performed above the C6-C7 level, as was done here, due to safety considerations (the epidural space becomes very narrow above that level, putting the spinal cord at significant risk from needle injury.) Despite never having performed any ESI at the C5-C6 level on this patient, and despite the fact the MRI indicated any radiating pain was likely not caused by a herniation a C5-C6, Dr. Misra recommended J.C. undergo spinal surgery at C5-C6. (Ex. 33, J.C. 09/11/18 Evaluation.)

_____

[3] Dr. Misra did not record his surgical recommendation for K.L. in his initial Evaluation.

**H.      All of the Above Procedures Were Recommended and Performed to Inflate the Value of BI and UM Claims**

62.      The purported services described above were designed and carried out to enrich Defendants by inflating the value of BI and UM Claims submitted to State Farm Mutual and State Farm County, causing State Farm Mutual and State Farm County to settle BI and UM Claims that otherwise might not have been settled or pay substantially more to settle the claims, from which Defendants received payment on their fraudulent bills.

63.      For each ESI purportedly performed, Defendants prepare a bill for the procedure. For cervical interlaminar ESIs, Defendants typically bill $3,300 for the specific procedure code and an additional $535 for improperly unbundled drugs and supplies for a total procedure charge of $3,835.   For lumbar interlaminar ESIs, Defendants typically bill $3,802 for the specific procedure code and likewise bill an additional $535 for improperly unbundled drugs and supplies for a total procedure charge of $4,337.  (*See, e.g.*, Ex. 34, Sample Bill.)

64.      Defendants' bills are intended to inflate the value of BI and UM Claims by increasing the medical expenses allegedly incurred, or which may be incurred, by the patients allegedly as a result of their accidents, to induce State Farm Mutual and State Farm County to settle those claims within policy limits, and often at or near policy limits, to protect themselves and their insureds from potential judgments exceeding policy limits and/or avoid potential liability for bad faith claims.

**I.       State Farm Mutual and State Farm County's Injuries Are Directly Related to and a Natural Consequence of the Defendants' Fraudulent Scheme**

65.      Defendants are legally and ethically obligated to act honestly and with integrity. Yet, Defendants have submitted, and caused to be submitted, to State Farm Mutual and State Farm

County bills and documentation that are fraudulent because they represent the underlying services were actually rendered and were medically necessary when they were not.

66.     The object of the scheme is to enrich Defendants by causing State Farm Mutual and State Farm County to rely on their fraudulent documentation and bills, thereby incurring damages by agreeing to settle BI and UM Claims that otherwise might not have been settled, or by paying substantially more to settle BI and UM Claims than they would have had they known the Defendants' bills and supporting documentation were fraudulent. State Farm Mutual and State Farm County were the target of Defendants' scheme, and the damages incurred by State Farm Mutual and State Farm County were the direct result and natural consequence of the scheme.

67.     By reason of the Defendants' scheme, State Farm Mutual and State Farm County have been damaged more than $1.1 million in settling the BI and UM Claims at issue. Defendants' fraudulent documentation and bills were a substantial factor and, in fact, have caused State Farm Mutual and State Farm County to incur damages by agreeing to settle claims that otherwise might not have been settled, or by paying substantially more to settle these claims than they would have if they had known the bills and supporting documentation were fraudulent. State Farm Mutual and State Farm County were the target of Defendants' scheme and their damages are directly related to and a natural consequence of the scheme. As a result, State Farm Mutual and State Farm County are entitled to more than $1.1 million in damages, or to a lesser amount to be proven at trial, but no less than the amount Defendants actually received as a result of the scheme.

## V.    CAUSES OF ACTION

### FIRST CLAIM FOR RELIEF
### VIOLATION OF 18 U.S.C. § 1962(c)
### (Against Defendant Sanjay Misra, M.D.)

68.     State Farm Mutual and State Farm County incorporate, adopt, and re-allege as though fully set forth herein, each allegation in Paragraphs 1 through 67 above.

69.     Sanjay Misra, M.D., P.A. is a corporation and an "enterprise" (the "Misra P.A. Enterprise"), as that term is defined in 18 U.S.C. § 1961(4), that engages in, and the activities of which affect, interstate commerce.

70.     Dr. Misra is and has been employed by and/or associated with the Misra P.A. Enterprise.

71.     Since at least 2017 and continuing uninterrupted to the present, Dr. Misra has knowingly conducted and/or participated, directly or indirectly, in the conduct of the Misra P.A. Enterprise's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the above-described scheme to defraud State Farm Mutual and State Farm County by submitting and causing to be submitted fraudulent bills and supporting documentation for examinations, injections, and related services which either were not performed, were not legitimately performed, or were not medically necessary, which in turn caused settlement checks to be deposited in the U.S. mails by State Farm Mutual and State Farm County and delivered on or about the dates reflected on Ex. 4.

72.     Specifically, the bills and supporting documentation Dr. Misra submitted, and caused to be submitted, for these services through Misra P.A. are fraudulent because:

        a.     Dr. Misra does not perform legitimate examinations of the patients;

        b.     patterns in the findings and diagnoses within the Evaluations prepared by Dr. Misra prior to recommending injections are not credible and serve as

-28-

pretext to support their predetermined recommendations for medically unnecessary ESIs for nearly all patients reporting neck and/or back pain (*see* Ex. 1);

c.    the injections Dr. Misra recommends and purportedly performs are not recommended and performed because they are medically necessary, but rather to substantially inflate the severity and potential value of the patients' claims (*see* Ex. 2);

d.    the boilerplate Operative Reports prepared by Dr. Misra for the ESIs he purportedly performs are not credible based upon patterns in the patients' diagnoses and responses to the ESIs (*see* Ex. 2); and

e.    the surgical recommendations made by Dr. Misra are not recommended because they are medically necessary, but rather to substantially inflate the severity and potential value of the patients' claims (*see* Ex. 3.)

73.    The bills and corresponding mailings, which comprise the pattern of racketeering activity identified through the date of this Complaint, are described in part in Exs. 1-4, attached hereto.  Representative samples of these bills and supporting documentation are attached as Exs. 1-4.

74.    State Farm Mutual and State Farm County have been injured in their business and property by reason of the above-described conduct in excess of $1.1 million.  The fraudulent documentation and bills Defendants submitted, and caused to be submitted, through Misra P.A. are at the very least a substantial factor in inducing State Farm Mutual and State Farm County to settle BI and UM Claims they otherwise might not have settled, and by paying substantially more to settle BI and UM Claims than they would have paid had they known the bills and supporting documentation were fraudulent.  State Farm Mutual and State Farm County were the intended targets of the scheme, and their damages are directly related to and a natural consequence of the scheme.  As a result, State Farm Mutual and State Farm County are entitled to damages in excess of $1.1 million, or to a lesser amount to be proven at trial, but no less than the amounts Defendants actually received as a result of the scheme.

WHEREFORE, State Farm Mutual and State Farm County demand judgment against Defendants Sanjay Misra, M.D. and Sanjay Misra, M.D., P.A. for compensatory damages, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), plus interest, and any other relief the Court deems just and proper.

### SECOND CLAIM FOR RELIEF
### MONEY HAD AND RECEIVED
#### (Against All Defendants)

75.     State Farm Mutual and State Farm County incorporate, adopt, and re-allege as though fully set forth herein, each allegation in Paragraphs 1 through 74 above.

76.     State Farm Mutual and State Farm County conferred a benefit upon Defendants by paying over $6.5 million to settle the BI and UM Claims at issue, and Defendants' fraudulent bills and supporting documentation were at the very least a substantial factor in inducing State Farm Mutual and State Farm County to settle BI and UM Claims they otherwise might not have settled, and pay substantially more to settle BI and UM Claims than they would have had they known the bills and documentation were fraudulent.

77.     The money Defendants obtained in connection with State Farm Mutual and State Farm County's settlement payments on the BI and UM Claims at issue in equity and good conscience belongs to and should be returned to State Farm Mutual and State Farm County.

78.     Defendants are in a unique position to know the amount of money they received from the more than $6.3 million that State Farm Mutual has paid and the more than $200,000 State Farm County has paid to settle the BI and UM Claims at issue.  State Farm Mutual and State Farm County are not currently aware of the precise amount of money Defendants received.   However, based upon substantial amounts of Defendants' charges in the BI and UM Claims at issue—

approximately $2.5 million—State Farm Mutual and State Farm County allege, on information and belief, the amounts received by Defendants are substantial.

79.     Because Defendants' services were not performed, not legitimately performed, or not medically necessary, they had no value.  Therefore, in equity and good conscience, Defendants should be required to pay restitution to State Farm Mutual and State Farm County in an amount equal to the total amounts they received as a result of the over $6.5 million that State Farm Mutual and State Farm County collectively paid to settle the BI and UM Claims at issue.

80.     Based upon Defendants' material misrepresentations and other affirmative acts to conceal their conduct from State Farm Mutual and State Farm County, their injuries were inherently undiscoverable.  Despite State Farm Mutual and State Farm County's diligence in uncovering the injurious conduct, State Farm Mutual and State Farm County did not discover and should not have reasonably discovered its damages were attributable to Defendants' conduct until April 2019, at the earliest.

WHEREFORE, State Farm Mutual and State Farm County demand judgment against Defendants for the above-described damages plus interest and costs and for such other relief as the Court deems equitable, just, and proper.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), State Farm Mutual and State Farm County demand a trial by jury.

Dated this 26th day of July, 2022.

By:  s/ Eliot T. Burriss

Eliot T. Burriss (TX 24040611)
Katten Muchin Rosenman LLP
2121 North Pearl Street
Suite 1100
Dallas, TX 75201-2591
(214) 765-3600
eli.burriss@katten.com

Ross O. Silverman (IL 6226560)
Jared T. Heck (IL 6289711)
Katten Muchin Rosenman LLP
525 West Monroe Street
Chicago, IL 60661-3693
(312) 902-5200
ross.silverman@katten.com
jared.heck@katten.com

*Attorneys for Plaintiffs State Farm Mutual
Automobile Insurance Company and State
Farm County Mutual Insurance Company
of Texas*