# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
### SAN ANTONIO DIVISION

**STATE FARM MUTUAL AUTOMOBILE
INSURANCE COMPANY and
STATE FARM COUNTY MUTUAL
INSURANCE COMPANY OF TEXAS,**

     *Plaintiffs,*

**v.**                                               **Case No. SA-22-CV-806-JKP-HJB**

**SANJAY MISRA, M.D.; and
SANJAY MISRA, M.D., P.A.,**

     *Defendants.*

## MEMORANDUM OPINION AND ORDER

Before the Court is *Defendants' Motion to Dismiss* (ECF No. 13). Pursuant to Fed. R. Civ. P. 12(b)(1) and (6), Defendants Sanjay Misra, M.D., and Sanjay Misra, M.D., P.A. ("Defendants") seek dismissal of all claims in this case. Plaintiffs State Farm Mutual Automobile Insurance Company and State Farm County Mutual Insurance Company of Texas' ("Plaintiffs") have filed a response (ECF No. 16) and Defendants have filed a reply (ECF No. 18). After considering the motion, related briefing, and applicable law, the Court DENIES the motion.

### I. BACKGROUND

Plaintiffs are insurance companies. *See* Compl. (ECF No. 1) at 6. Defendant Sanjay Misra ("Misra") is a Texas licensed physician who provides medical services in San Antonio. *Id*. He is the president of Sanjay Misra, M.D., P.A., a Texas professional association. *Id*. at 7. Plaintiffs assert two claims. *See id*. at 28-31. They first assert a federal claim under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c). *See id*. ¶¶ 68-74. Then they assert a Texas claim for money had and received. *See id*. ¶¶ 75-80. They contend that Defendants treat patients who have been injured in automobile accidents by drivers they insure. *Id*. ¶¶ 2-10. They

specifically allege Misra submitted fraudulent medical bills and medical records because:

    a.      Dr. Misra does not perform legitimate examinations of his patients;

    b.      patterns in the findings and diagnoses within the examination reports ("Evaluations") prepared by Dr. Misra prior to recommending injections are not credible and serve as pretext to support their predetermined recommendations for medically unnecessary ESIs [(epidural steroid injections)] for nearly all patients reporting neck and/or back pain;

    c.      the injections Dr. Misra recommends and purportedly performs are not recommended and performed because they are medically necessary, but rather to substantially inflate the severity and potential value of the patients' claims;

    d.      the boilerplate operative reports ("Operative Reports") prepared by Dr. Misra for the ESIs he purportedly performs are not credible based upon patterns in the patients' diagnoses and responses to the ESIs; and

    e.      the surgical recommendations made by Dr. Misra are not recommended because they are medically necessary, but rather to substantially inflate the severity and potential value of the patients' claims.

*Id*. ¶ 3 (omitting citations to exhibits).

Plaintiffs provide additional facts relating to Defendants' alleged scheme. *See id*. ¶ 8. In particular, they allege that to facilitate the scheme, Defendants:

    (a) prepare fraudulent Evaluations to create the appearance patients suffered serious injuries that warrant ESIs, often to more than one spinal region;

    (b) purportedly perform medically unnecessary injections;

    (c) prepare bills from Misra P.A. with typical charges of $499 for the initial examinations and typical charges of at least $3,300 for each ESI;

    (d) often recommend patients undergo surgeries, which are estimated to cost in excess of $50,000 (not including fees for anesthesia and related items Dr. Misra estimates cost an additional $50,000); and

    (e) provide their fraudulent documentation and bills to the PI Attorneys representing the patients in BI Claims and UM Claims who, in turn, submit the documentation and bills to State Farm Mutual and State Farm County to support written demands to settle the claims within policy limits, often within 15 days or less.

*Id*.

Plaintiffs' essential allegation is that Misra recommends and administers medically unnec-

essary epidural steroid injections and recommends and performs medically unnecessary surgeries to inflate medical bills to increase the value of his patients' bodily injury or uninsured/underinsured claims. According to Plaintiffs, Misra submits the medical bills and records to his patients' personal injury attorneys to submit demands to Plaintiffs to settle the patients' claims. *Id*. at ¶¶ 9-10.

Plaintiffs attached thirty-four exhibits to their complaint. The first exhibit is a spreadsheet titled "Pre-Injection Appendix." ECF No. 1-3. The eight-page exhibit has twenty columns (A through T) which provide detailed information for patients treated by Misra. *Id*. The exhibit includes the State Farm claim number (Column B), patient initials (Column C), date of the underlying accident (Column D), date of first visit to Misra (Column F), Misra's recommendation for injection (Column S), and the type of injection Misra recommended (Column T). *Id*. Columns G through R reflect the tests or exams Misra conducted to determine whether to administer an injection and the type of injection to administer. *Id*. Citing Exhibits 1 and 2, Plaintiffs allege that "Dr. Misra's Evaluations reveal the same cursory examination findings and result in recommendations that virtually all patients with neck and/or back pain receive a recommendation for an interlaminar ESI."[1] Compl. ¶ 28. Misra recommended and/or administered spinal injections for 300 of 335 patients identified on Exhibit 1. *Id*. ¶ 29. Misra recommended that each of these 300 patients receive the same type of ESI injection—the interlaminar ESI. *Id*.; *see also* ECF No. 1-3.

Plaintiffs contend Misra's medical evaluations and findings "are boilerplate, include nonspecific information about patients' conditions, and reveal noncredible patterns." Compl. ¶ 40. Plaintiffs note Misra almost always lists a patient's chief complaint as "radiating pain" and "numbness." *Id*.; *see* ECF No. 1-3 (Columns G-H). In most instances, Misra's physical exam reflects patients exhibiting tenderness or pain with soft tissue palpitations, motor strength deficits, and

---

[1] An interlaminar ESI involves inserting a needle into the posterior epidural space between two adjacent vertebral lamina and delivering anesthetic and steroids, which then typically spread to epidural spaces above and below the injected space.

3

decreased or diminished sensation in the affected area. Compl. ¶ 40. Plaintiffs identify a number of other tests and findings which are similar for most of the patients listed in Exhibit 1. *Id*. ¶¶ 40-49.

Plaintiffs attached an Injection Appendix (Exhibit 2) which lists the ESI injections administered by Misra. *See* ECF No. 1-4. Exhibit 2 identifies 276 patients who received a total of 792 interlaminar injections. *Id*. Plaintiffs contend Misra does not document his pre-injection diagnosis in the patient evaluation forms, but only includes the diagnosis in the operative reports of patients who actually receive an ESI. Compl. ¶ 54. Plaintiffs essentially allege Misra does not actually perform a preoperative diagnosis but provides a diagnosis when the injection is administered. *Id*. Plaintiffs further allege that virtually all patients who receive ESIs from Misra have the same diagnosis. *Id*. Plaintiffs also attached a deposition transcript of one patient and her experience with Misra regarding an attempt to administer an ESI injection. *See id*.; Tr. of A.M. 42:21-43:17 (ECF No. 1-25). Misra allegedly told the patient who was concerned about receiving the injection, "[well], no shot, no money." Tr. of A.M. 43:15-17.

Plaintiffs allege a similar pattern regarding Misra's surgical recommendations. They attached a Surgical Recommendation Appendix (ECF No. 1-5 (Ex. 3)) to their complaint, which reflects that Misra recommended surgery for approximately half of the patients for whom he also recommended ESI injections. Compl. ¶ 58; Surgical Recom. App'x. Plaintiffs allege Misra recommended surgery for patient K.L. during his first visit before considering nonsurgical options. Compl. ¶ 60; Tr. of K.L. 119:21 (ECF No. 1-26 (Ex. 24)). Plaintiffs contend Misra administered ESI to K.L. even though he had already determined that surgery was necessary. Compl. ¶ 60.

Plaintiffs also contend Misra's evaluation of and surgical recommendation for patient J.C. indicates a pattern of recommending surgeries that are unnecessary. *Id*. ¶ 61. Plaintiffs allege Misra recommended spinal surgery for J.C. despite MRI findings which state there was "no significant

central canal or neural foraminal narrowing," which means J.C.'s herniation was not causing radiating pain. *Id*. Plaintiffs contend Misra recommended J.C. undergo spinal surgery at C5-C6 even though there is not a clear record J.C. experienced radiating pain at this level. *Id*. The Court has independently evaluated the exhibits regarding Plaintiffs' contention regarding Misra's surgical recommendation for J.C. (Exs. 31, 32, and 33), and finds the medical records do not explicitly state J.C. was not experiencing radiating pain. Despite this lack of clarity, the medical records offer enough support for Plaintiffs' contention at this stage of litigation. Challenge to this type of allegation is better suited for summary judgment.

Plaintiffs state Defendants charge $3,300 for each cervical interlaminar ESI and an additional $535 for unbundled drugs and supplies for a total of $3,835. For lumbar interlaminar ESIs, Defendants charge $3,802 for each injection and an additional $535 for unbundled drugs and supplies for a total of $4,337. *Id*. ¶ 63; *see also* Ex. 34 for sample billing practices. Plaintiffs allege more than $1.1 million in damages based on Defendants' fraudulent medical records and bills which were created to inflate the value of the patients' bodily injury and uninsured/underinsured motorist claims, which in turn caused Plaintiffs to pay more to settle the claims. *Id*. ¶¶ 64-67.

## II. MOTION TO DISMISS

Pursuant to Fed. R. Civ. P. 12(b)(1), Defendants seek to dismiss Plaintiffs' RICO claim for lack of standing. And, pursuant to Fed. R. Civ. P. 12(b)(6), Defendants seek to dismiss both Plaintiffs' RICO claim and their state-law claim for lack of sufficient factual allegations.

"When a Rule 12(b)(1) motion is filed in conjunction with other Rule 12 motions, the court should consider the Rule 12(b)(1) jurisdictional attack before addressing any attack on the merits." *Randall D. Wolcott, M.D., P.A. v. Sebelius*, 635 F.3d 757, 762 (5th Cir. 2011) (quoting *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001)). By first considering a Rule 12(b)(1) motion, courts avoid "prematurely dismissing a case with prejudice" when it lacks jurisdiction. *Ramming*,

281 F.3d at 161. A "court's dismissal of a plaintiff's case because the plaintiff lacks subject matter jurisdiction is not a determination of the merits and does not prevent the plaintiff from pursuing a claim in a court that does have proper jurisdiction." *Id.* For reasons that will become more apparent later, the Court sees no reason for an involved analysis of the jurisdictional issue. And, because Defendants seek dismissal of Plaintiffs' RICO claim under both Rule 12(b)(1) and Rule 12(b)(6), the Court will consider the jurisdictional issue at the beginning of its analysis of the RICO claim.

Under Rule 12(b)(6), litigants may move to dismiss asserted claims for "failure to state a claim for which relief can be granted." As required by Fed. R. Civ. P. 8(a)(2), every pleading that states a claim for relief must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Such requirement provides opposing parties "fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)).

In general, a court addressing a motion under Rule 12(b)(6) "must limit itself to the contents of the pleadings, including attachments thereto." *Brand Coupon Network, LLC v. Catalina Mktg. Corp.*, 748 F.3d 631, 635 (5th Cir. 2014) (citation omitted). The Federal Rules of Civil Procedure specifically recognize that "a copy of any written instrument which is an exhibit to a pleading is a part thereof for all purposes." Fed R. Civ. P. 10 (c). "Documents attached to a complaint are viewed as part of the plaintiff's pleadings." *Gen. Elec. Cap. Corp. v. Posey*, 415 F.3d 391, 398 n.8 (5th Cir. 2005). It has long been recognized that courts may read allegations in a pleading in tandem with exhibits attached to the pleading. *See Zinermon v. Burch*, 494 U.S. 113, 118 (1990); *Caine v. Hardy*, 943 F.2d 1406, 1411 (5th Cir. 1991). Here, Plaintiffs attached thirty-four exhibits to their complaint. Both sides refer to the exhibits in their briefing, and there is no basis to not consider them in resolving the pending motion. Thus, the Court will consider the exhibits in resolving the pending motion.

When ruling on a motion to dismiss, courts construe the operative pleading "in the light most favorable to the [non-movant] and draw all reasonable inferences in the [non-movant's] favor." *Severance v. Patterson*, 566 F.3d 490, 501 (5th Cir. 2009). Despite the natural focus on the allegations of the operative pleading, the party moving for dismissal under Rule 12(b)(6) "carries the burden of proof for dismissal." *Newton v. Bank of Am., N.A.*, No. CV SA-19-CA-797-FB, 2019 WL 6048000, at *2 (W.D. Tex. Aug. 29, 2019). Courts, furthermore, may find conclusory statements insufficient to support dismissal under Rule 12(b)(6), especially when the movant disregards relevant portions of the operative pleading. *See #1 Fan Co., LLC v. Pepco Licensed Prod., Inc.*, No. SA-09-CA-1029-FB, 2011 WL 13269165, at *2 (W.D. Tex. Mar. 16, 2011).

"[A] well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of [the alleged] facts is improbable, and 'that a recovery is very remote and unlikely.'" *Twombly*, 550 U.S. at 556 (citation omitted). Nevertheless, parties asserting a claim must provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* at 555; *accord Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (emphasizing that "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions"). Facts alleged must "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. To survive a Rule 12(b)(6) motion, the operative pleading must plead "enough facts to state a claim to relief that is plausible on its face." *Id.* at 570.

> A claim has facial plausibility when the [asserting party] pleads factual content that allows the court to draw the reasonable inference that the [opposing party] is liable for the misconduct alleged. The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that [an opposing party] has acted unlawfully. Where a [pleading] pleads facts that are "merely consistent with" [an opposing party's] liability, it "stops short of the line between possibility and plausibility of 'entitlement to relief.'"

*Iqbal*, 556 U.S. at 678 (citations omitted). As *Twombly* states, to avoid dismissal under Rule 12(b)(6), the non-movant must allege facts that "nudge" an asserted claim "across the line from

conceivable to plausible." 550 U.S. at 570. The focus is not on whether the non-movant will ulti-mately prevail, but whether that party should be permitted to present evidence to support ade-quately asserted claims. *Id.* at 563 n.8.

## A. RICO

The RICO statute makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c). "Any person injured in his business or property by reason of a violation of section 1962" may bring a civil suit for treble damages. *Id*. § 1964(c). "To state a claim under § 1962(c), a plaintiff must adequately plead that the defendant engaged in '(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity.'" *Molina-Aranda v. Black Magic Enters., LLC*, 983 F.3d 779, 784 (5th Cir. 2020) (quoting *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 (1985)).

RICO claims "have three common elements: '(1) a person who engages in (2) a pattern of racketeering activity, (3) connected to the acquisition, establishment, conduct, or control of an enterprise.'" *St. Germain v. Howard*, 556 F.3d 261, 263 (5th Cir. 2009) (per curiam) (quoting *Abraham v. Singh*, 480 F.3d 351, 355 (5th Cir. 2007)). "A pattern of racketeering activity consists of two or more predicate acts that are (1) related and (2) amount to or pose a threat of continued criminal activity." *Snow Ingredients, Inc. v. SnoWizard*, Inc., 833 F.3d 512, 524 (5th Cir. 2016) (quoting *St. Germain*, 556 F.3d at 263).

A plaintiff asserting a RICO claim must plausibly allege the violation proximately caused the plaintiff's injuries. *Holmes v. Secs. Inv. Prot. Corp.*, 503 U.S. 258, 268 (1992). Proximate cause in the context of a RICO claim is not one of foreseeability, and the plaintiff must establish that the alleged RICO violations "led directly" to the claimed the injuries. *Anza v. Ideal Steel Supply Corp.*,

547 U.S. 451, 461 (2006). "If some other conduct caused the harm, the plaintiff cannot sustain a RICO claim." *Molina-Aranda*, 983 F.3d at 784; *accord Hemi Grp., LLC v. City of N.Y.*, 559 U.S. 1, 10 (2010) (rejecting a RICO claim on proximate causation grounds "because the conduct directly causing the harm was distinct from the conduct giving rise to the fraud"). "Consistent with [Fed. R. Civ. P.] 9(b), a RICO plaintiff alleging predicate acts of fraud . . . must plead the circumstances of that fraud with particularity." *Molina-Aranda*, 983 F.3d at 784 n.2.

### 1. "Standing" to Assert a RICO Claim

Defendants contend that Plaintiffs cannot establish Article III (constitutional) and statutory standing under the RICO statute. ECF No. 13 at 5-9. Article III and statutory standing are analyzed separately. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 84 (1998). To the extent Defendants contend Plaintiffs cannot plausibly allege a valid or viable RICO claim, the Court will analyze such arguments under Rule 12(b)(6), not Rule 12(b)(1). These alleged pleading defects are not "questions of subject-matter jurisdiction—i.e., the *power* of the Court to hear the case—Rule 12(b)(1) is not the proper vehicle for Defendants' challenge." *Meier v. UHS of Del., Inc.*, No. 4:18-CV-00615, 2019 WL 6465314, at *5 (E.D. Tex. Dec. 2, 2019). "Although statutory standing involves an inquiry into the alleged injury, it is not synonymous with Article III standing." *HCB Fin. Corp. v. McPherson*, 8 F.4th 335, 339 (5th Cir. 2021). The Fifth Circuit has also noted that the use of the phrase "RICO Act standing" should be avoided because subject-matter jurisdiction is not implicated. *Gil Ramirez Grp., LLC v. Hous. Indep. Sch. Dist.*, 786 F.3d 400, 409 n.8 (5th Cir. 2015) (citing *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 128 n.4 (2014)). To the extent Defendants' motion is based on Rule 12(b)(1), it is denied. Because it is clear Plaintiffs have established Article III standing, the Court will analyze Defendants' challenges under Rule 12(b)(6).[2]

---

[2] The Court also rejects Defendants' argument that Plaintiffs have not suffered injury to their business or property.

## 2. **RICO Person and RICO Entity**

According to Defendants, Plaintiffs barely identify Misra as a RICO person in a few paragraphs in the complaint, but otherwise lumps defendants "together such that neither have been notified what State Farm claims forms the basis of liability against either." ECF No. 13 ¶ 22. Defendants also contend "State Farm further fails to plead any facts showing the alleged RICO enterprise of Sanjay Misra, M.D., P.A. had any existence or purpose separate from committing mail fraud." *Id*.

Plaintiffs respond by citing to the RICO statute which defines an enterprise as "any individual, partnership, corporation, association or other legal entity, and any union or group of individuals associated in fact although not a legal entity." ECF No. 16 at 11 (citing 18 U.S.C. § 1961(4)). They state that Misra P.A., which is a professional association under Texas law and a legal entity, is the RICO enterprise. *Id*. (citing Compl. ¶¶ 8, 69). They further state that Misra himself is the only RICO person/defendant identified in the complaint. *Id*. (Compl. ¶¶ 8, 69). Furthermore, they assert that Misra (the RICO person) and Misra P.A. (the RICO enterprise) are distinct. *Id*. (citing *Cedric Kushner Promotions, Ltd v. King*, 533 U.S. 158, 161-62 (2001)).

Viewing the allegations of the complaint in the light most favorable to Plaintiffs, the Court finds sufficient factual allegations that Misra is distinct from Misra P.A., and that Misra allegedly used Misra P.A. for unlawful purposes. In *King*, the Supreme Court noted:

> We do not quarrel with the basic principle that to establish liability under § 1962(c) one must allege and prove the existence of two distinct entities: (1) a "person"; and (2) an "enterprise" that is not simply the same "person" referred to by a different name. The statute's language, read as ordinary English, suggests that principle. The Act says that it applies to "person[s]" who are "employed by or associated with" the "enterprise." In ordinary English one speaks of employing, being employed by, or associating with others, not oneself. In addition, the Act's purposes are consistent with that principle. Whether the Act seeks to prevent a person from victimizing, say, a small business or to prevent a person from using a corporation for criminal purposes, the person and the victim, or the person and the tool, are different entities, not the same.

533 U.S. at 161-62 (citations omitted).

"The corporate owner/employee, a natural person, is distinct from the corporation itself, a legally different entity with different rights and responsibilities due to its different legal status." *Id*. at 163. The Court also stated,

> Linguistically speaking, an employee who conducts the affairs of a corporation through illegal acts comes within the terms of a statute that forbids any "person" unlawfully to conduct an "enterprise," particularly when the statute explicitly defines "person" to include "any individual . . . capable of holding a legal or beneficial interest in property," and defines "enterprise" to include a "corporation." And, linguistically speaking, the employee and the corporation are different "persons," even where the employee is the corporation's sole owner. After all, incorporation's basic purpose is to create a distinct legal entity, with legal rights, obligations, powers, and privileges different from those of the natural individuals who created it, who own it, or whom it employs.

*Id*. (quoting 18 U.S.C. §§ 1961(3) and (4) while otherwise omitting citations).

Because Plaintiffs have sufficiently alleged that Misra is distinct from Misra P.A., and that Misra allegedly used Misra P.A. for unlawful purposes, Defendants' argument here fails.

### 3. Defendants Contend Plaintiffs' Claims Are Too Attenuated (Proximate Cause)

Defendants contend that Plaintiffs' causal chain for their RICO claim is too attenuated, which the Court construes as a challenge to Plaintiffs' allegations regarding the proximate cause of their injuries. Plaintiffs' basic contention in this case is that Defendants engaged in a fraudulent scheme of inflating their patients' (who were also personal injury plaintiffs) medical bills based on unnecessary medical services (steroid injections and surgeries) to submit to Plaintiffs to maximize Defendants' reimbursement when the patients settled their bodily injury and uninsured/underinsured claims.

Plaintiffs' claims and Defendants' challenge to the pleadings in this case are very similar to the issues in *Allstate Insurance Company, v. Benhamou*, 190 F. Supp. 3d 631 (S.D. Tex. 2016). In *Benhamou*, "Allstate's alleged harm [wa]s the overpayment of at least 51 claims based on fraudulent bills and reports, and the alleged fraud is Defendants' submissions of fraudulent bills and

reports, which Allstate then paid by settlement checks sent via the U.S. mail." 190 F. Supp. 3d at 645-46. The Southern District determined that Allstate was not an "indirect or incidental party to the fraud," but was the object of the fraud. *Id*.; *accord Allstate Ins. Co. v. Plambeck*, 802 F.3d 665, 676 (5th Cir. 2015) (concluding proximate cause was satisfied in a similar case because the "[t]he objective of the enterprise was to collect from insurance companies; . . .Allstate's paying up was not just incidental but was the object of the collaboration."). Here, just like in *Benhamou*, Defendants argue the actions of third parties (the lawyers representing Defendants' patients) make the claimed injury too attenuated. 190 F. Supp. 3d at 645-46. Rejecting a similar argument, the court in *Benhamou* stated "[r]egardless of any third party's actions, Allstate's harm would not have occurred if Defendants had not submitted fraudulent 'records, reports, billings, and other documents . . . substantiating the unnecessary and inflated services." *Id*. at 647.

Assuming the truth of the allegations at this stage of litigation, the Court concludes Plaintiffs have alleged sufficient facts to directly connect alleged fraudulent conduct of Defendants to Plaintiffs' alleged harm.

### 4. Pleading Predicate Act of Mail Fraud with Particularity

Defendants contend that Plaintiffs failed to plead the predicate act of mail fraud with particularity. The RICO statute defines "racketeering activity," and identifies a number of predicate criminal acts including "section 1341 (relating to mail fraud)." *See* 18 U.S.C. § 1961(1). "The mail fraud statute applies to anyone who knowingly causes to be delivered by mail anything for the purpose of executing any scheme or artifice to defraud." *United States v. Whitfield*, 590 F.3d 325, 355 (5th Cir. 2009). The particularity pleading requirements of Fed. R. Civ. P. 9(b) apply to RICO claims based on predicate acts of fraud. *Molina-Aranda v. Black Magic Enters., LLC*, 983 F.3d 779, 784 n.2 (5th Cir. 2020); *Williams v. WMX Techs., Inc.*, 112 F.3d 175, 177 (5th Cir. 1997).

"Using the mail to execute or attempt to execute a scheme to defraud is indictable as mail

fraud, and hence a predicate act of racketeering under RICO, even if no one relied on any misrepresentation." *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 648 (2008). Similarly, "one can conduct the affairs of a qualifying enterprise through a pattern of such acts without anyone relying on a fraudulent misrepresentation." *Id.* at 649. Consequently, "no showing of reliance is required to establish that a person has violated § 1962(c) by conducting the affairs of an enterprise through a pattern of racketeering activity consisting of mail fraud." *Id.* Citing *Bridge*, the Fifth Circuit recognized that "the Supreme Court [had] recently held that no reliance requirement exists for civil causes of action under RICO for victims of mail fraud." *St. Germain v. Howard*, 556 F.3d 261, 263 (2009) (per curiam). Accordingly, the Fifth Circuit overruled prior circuit precedent "to the extent that [those] cases are in conflict with *Bridge*." *Id.*

"The gravamen of the [mail fraud] offense is the scheme to defraud, and any 'mailing that is incident to an essential part of the scheme satisfies the mailing element.'" *Bridge*, 553 U.S. at 647 (quoting *Schmuck v. United States*, 489 U.S. 705, 712 (1989)). To establish that a mailing is "incident to an essential part of the scheme," one must establish that the completed scheme "depend[ed] in some way on the information or documents that passed through the mail." *United States v. Tencer*, 107 F.3d 1120, 1125 (5th Cir. 1997). "When considering the relationship between a mailing and a fraudulent scheme, 'the question . . . is whether the mailings themselves somehow contributed to the successful continuation of the scheme—and, if so, whether they were so intended by [the defendant].'" *United States v. Swenson*, 25 F.4th 309, 317 (5th Cir. 2022) (quoting *United States v. Strong*, 371 F.3d 225, 230 (5th Cir. 2004)). One may violate the statute even when not "us[ing] the mails himself or actually intend[ing] that the mail be used." *United States v. Ingels*, 445 F.3d 830, 835 (5th Cir. 2006) (citation omitted). It is enough that a defendant caused it to be done, *Pereira v. United States*, 347 U.S. 1, 8 (1954), and "that the mailing caused by the defendant's actions be incident to an essential part of the scheme," *Ingels*, 445 F.3d at 835 (citation and

internal quotation marks omitted).

An actor "causes the mails to be used where he does an act with knowledge that the use of the mails will follow in the ordinary course of business, or where such use can reasonably be foreseen, even though not actually intended." *United States v. Maze*, 414 U.S. 395, 399 (1974). "The test to determine whether a defendant caused the mails to be used is whether the use was reasonably foreseeable. The defendant need not intend to cause the mails to be used." *R.A.G.S. Couture, Inc. v. Hyatt,* 774 F.2d 1350, 1354 (5th Cir.1985).

Plaintiffs assert that Defendants prepared fraudulent bills and supporting medical documents to send to personal injury attorneys, who in turn, included the purportedly fraudulent bills and records in settlement demand packages to Plaintiffs (as the insurers of the allegedly at fault driver in the underlying automobile accident). ECF No. 16 at 15. Personal injury attorneys would then use the bills/records to request settlements at or near policy limits. *Id*. Plaintiffs would settle the claims based on the allegedly inflated value created by the purportedly fraudulent bills/records, and then used mail to send the settlement checks as payment for the claims. *Id*. The allegations in the complaint along with the attached exhibits support these assertions and are sufficient to plausibly allege a predicate act of mail fraud.

### 5. <u>Plaintiffs Sufficiently Allege Fraudulent Intent</u>

Defendants contend that "State Farm fails to adequately allege the specific-intent of why." ECF No. 13 ¶¶ 34-37. But as made clear by Fed. R. Civ. P. 9(b): "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally."

Furthermore, the Southern District of Texas has rejected a similar challenge to State Farm's RICO claim predicated on mail fraud. *See State Farm Mut. Auto. Ins. Co. v. Punjwani, M.D.*, No. CV H-19-1491, 2019 WL 7372215, at *4 (S.D. Tex. Dec. 31, 2019). As explained in that rejection,

"[f]raudulent intent . . . can be plausibly inferred from State Farm's Complaint and attached appendices that highlight the pattern of numerous cases in which Dr. Punjwani and PAIN allegedly provided fraudulent diagnoses and medically unnecessary treatment." *Id.*; *accord Allstate Ins. Co. v. Plambeck*, 802 F.3d 665, 675 (5th Cir. 2015) (finding that circumstantial evidence that defendants participated in a scheme to defraud insurance companies was enough to prove intent for mail fraud). Here, Plaintiffs assert the same allegations that were asserted in *Punjwani*, and the Court finds Plaintiffs' allegations regarding intent sufficient.

## B. MONEY HAD AND RECEIVED

"A case for money had and received looks solely to whether the defendant holds money that belongs to the plaintiff." *Mission Toxicology, LLC v. Unitedhealthcare Ins. Co.*, 499 F. Supp. 3d 350, 369 (W.D. Tex. 2020) (quoting *Aetna Life Ins. Co. v. Humble Surgical Hosp., LLC*, No. CV H-12-1206, 2016 WL 7496743, at *2 (S.D. Tex. Dec. 31, 2016)). For such a claim, "Texas follows the ordinary principles of common law":

> The question, in an action for money had and received, is to which party does the money, in equity, justice, and law, belong. All plaintiff need show is that defendant holds money which in equity and good conscience belongs to him. Again, it has been declared that a cause of action for money had and received is less restricted and fettered by technical rules and formalities than any other form of action. It aims at the abstract justice of the case, and looks solely at the inquiry, whether the defendant holds money, which belongs to the plaintiff.

*Bank of Saipan v. CNG Fin. Corp.*, 380 F.3d 836, 840 (5th Cir. 2004) (quoting *Staats v. Miller*, 243 S.W.2d 686, 687-88 (Tex. 1951)). "Such a claim 'is equitable in nature' and 'is not premised on wrongdoing, but looks only to the justice of the case and inquires whether the defendant has received money which rightfully belongs to another.'" *City of San Antonio v. Time Warner Cable, Tex. LLC*, 532 F. Supp. 3d 402, 428 (W.D. Tex. 2021) (quoting *Plains Exploration & Prod. Co. v. Torch Energy Advisors Inc.*, 473 S.W.3d 296, 302 n.4 (Tex. 2015)).

As explained above, Plaintiffs have pled sufficient facts regarding Misra's (using Misra

P.A.) alleged scheme to perform unnecessary procedures (ESI injections and surgeries) to inflate the value of his patients' personal injury and uninsured/underinsured claims and submitted the medical records and bills to the patients' attorneys. State Farm paid the alleged artificially inflated claims to settle them, and Defendants received money, which in equity and good conscience, belongs to Plaintiffs. Defendants' motion to dismiss the money had and received claim is denied.

### III. CONCLUSION

For the foregoing reasons, the Court **DENIES** *Defendants' Motion to Dismiss* (ECF No. 13).

**SIGNED this 24th day of February 2023.**

**JASON PULLIAM**
**UNITED STATES DISTRICT JUDGE**